UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL S. RHINEHART,

    Plaintiff,

    v.                                                                 Case No. 06-C-0993

MEDICAL COLLEGE OF WISCONSIN, INC.,

    Defendant.

**DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

### I. PROCEDURAL BACKGROUND

This action was commenced on September 21, 2006, when the *pro se* plaintiff, Michael S. Rhinehart ("Rhinehart"), filed a complaint in which he alleges that the defendant, Medical College of Wisconsin, Inc. ("MCW" or "the College"), discriminated against him on the basis of race. Specifically, Rhinehart alleges that he was unlawfully denied a promotion and then terminated because he is black.

On February 7, 2007, the court conducted a scheduling conference with the parties. At that time dates were set for the processing of the case. More precisely, all discovery was to be completed by August 1, 2007, and all dispositive motions were to be filed no later than September 4, 2007. In accordance with that schedule, on September 4, 2007, MCW filed a motion for summary judgment, together with a legal brief, a set of proposed findings of fact pursuant to Civ. L.R. 56.2, and other written materials in support of the motion. Pursuant to Civ. L.R. 7.1(c), Rhinehart had thirty (30) days, or until October 4, 2007, to file his response and accompanying materials in accordance with

Civ. L.R. 56.2. As of October 22, 2007, Rhinehart had not done so. Thus, the court issued an order granting Rhinehart until November 15, 2007 to file his response and accompanying materials. That same order advised him that if no response was filed, the court would consider Rhinehart to have waived his right to file a response and would proceed to decide the defendant's motion for summary judgment.

On November 5, 2007, Rhinehart filed with the court copies of what purport to be a letter and a memo, the letter being addressed to Christine Brunow of the Wisconsin Equal Rights Division and the memo being directed to Gwynne Dilday, VP Human Resources; James Hopp, Director Facilities; and David Krumei, Assistant Director Facilities. The date on the face of the letter is April 19, 2006. Handwritten on the top of the letter is the following: "Plaintiffs response to defendants motion for summary judgment. Materials ask for by defendant." Handwritten on the bottom of the memo is the following: "This letter was sent to the MCW Human Resources Department around June of 2002." Neither document is under oath. Nothing further was filed by Rhinehart in response to the defendant's motion for summary judgment.

On November 21, 2007, the defendant filed its reply brief in support of its motion. Such being the case, the defendant's motion for summary judgment is now fully briefed and is ready for resolution.

The court has subject matter jurisdiction in this action pursuant to 28 U.S.C. § 1331, as Rhinehart's *pro se* complaint seeks relief for alleged race discrimination in the termination of employment, a claim that is cognizable pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e - 2000e-17. Venue in the Eastern District of Wisconsin is proper, as the events giving rise to the complaint took place within this judicial district.

For the reasons which follow, the defendant's motion will be granted.

## II. FACTS

In accordance with Civ. L.R. 56.2, along with its motion for summary judgment the defendant filed a set of proposed findings of fact. Rhinehart failed to comply with Civ. L.R. 56.2 in that he failed to file "[a] specific response to [MCW's] proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists." Thus, in accordance with Civ. L.R. 56.2(e) in deciding this motion for summary judgment, "the Court must conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out." Stated another way, the court must conclude that the defendant's proposed findings of fact are correct. Such being the case, the following are the undisputed facts in this case.

Defendant MCW is a private, academic institution dedicated to leadership and excellence in the following areas: (1) Education - preparing the physicians and scientists of tomorrow while enhancing the skills of today's health professionals; (2) Discovery - creating new knowledge in basic, translational, and patient-based research to improve human health; (3) Patient Care - providing effective, compassionate, expert care for patients; and (4) Community Engagement - partnering with public and private organizations to enhance learning, research, patient care and the health of the community. (Defendant's Proposed Finding of Fact ("DPFOF") ¶ 1.)

MCW's primary campus is located at 8701 Watertown Plank Road, Milwaukee, Wisconisn 53226. (DPFOF ¶ 2.)

Plaintiff Michael Rhinehart is a resident of Milwaukee County, Wisconsin. (DPFOF ¶ 3.)

Rhinehart is a former employee of MCW. (DPFOF ¶ 4.)

Rhinehart is African-American. (DPFOF ¶ 5.)

MCW hired Rhinehart in 1997 as a Teaching Facilities Technical Assistant. (DPFOF ¶ 8.)

Tom D'Amico ("D'Amico"), then a Supervisor in the Department of Facilities, and David Krumrei ("Krumrei"), Assistant Director for the Department of Facilities, interviewed and hired Rhinehart. (DPFOF ¶ 9.)

As a Teaching Facilities Technical Assistant, Rhinehart's duties included setting up audiovisual equipment throughout MCW's campus, ensuring that this equipment was operaing correctly, and performing audiovisual taping. (DPFOF ¶ 10.)

Rhinehart's direct supervisor at the beginning of his employment was D'Amico. (DPFOF ¶ 11.) D'Amico gave Rhinehart average marks on his six-month performance review, which Rhinehart received on February 6, 1998. (DPFOF ¶ 12.)

On August 3, 1998, Rhinehart received another average performance review from D'Amico, which covered his first year of employment at MCW. (DPFOF ¶ 13.) On this review, however, D'Amico ranked Rhinehart below expectations with respect to his handling of computer reservations. (DPFOF ¶14.) Rhinehart considered this a fair criticism. (DPFOF ¶ 15.)

Rhinehart received his second annual performance review on or around November 17, 1999. (DPFOF ¶ 16.) D'Amico had left MCW by this time, so Krumrei completed the review and gave Rhinehart average to slightly above-average marks. (DPFOF ¶ 17.)

In late 1999, Rhinehart filled out an internal application for a Senior Teaching Facilities Technician position. (DPFOF ¶ 18.) Rhinehart understood that in order to obtain a different position within MCW, he needed to fill out an internal application. (DPFOF ¶ 19.) He received the Senior Teaching Facilities Technician job. (DPFOF ¶ 20.)

MCW did not immediately fill D'Amico's position. (DPFOF ¶ 21.)

From D'Amico's departure in late 1999 until July 2000, Rhinehart was the only full-time employee in the Department of Facilities, and he bore responsibility for the Department's day-to-day activities with respect to the teaching facilities. (DPFOF ¶ 22.)

In 2000, Rhinehart made errors in entering room assignments in the computer and in taking notes and messages. (DPFOF ¶ 23.) Rhinehart admits that Krumrei fairly criticized him for these errors. (DPFOF ¶ 24.)

Krumrei suggested to Rhinehart, on more than one occasion, that Rhinehart should attend computer training on work time and at MCW's expense. (DPFOF ¶ 25.) Krumrei expressed that he believed the training would help Rhinehart in performing his job. (DPFOF ¶ 26.) Rhinehart never went for the training. (DPFOF ¶ 27.) In response to Krumrei's offer of computer training, Rhinehart told Krumrei that "it's worthless to do this. It's not going to help me. Why should I take some computer training course that's not - it's not involved with this job? It doesn't make sense to me." (DPFOF ¶ 28.)

On May 30, 2000, the course directors for first-year and second-year medical students sent a memorandum to Douglas Campbell, MCW's Senior Vice President, in which they expressed serious concerns with the operation of the Department of Facilities. (DPFOF ¶ 29.) The directors conveyed that they had reached "universal agreement about three significant problem areas that impacted upon our efforts to provide excellent instruction to our medical and graduate students. These relate to areas of scheduling, day to day classroom services, and equipping the teaching auditoriums." (DPFOF ¶ 30.) The course directors characterized "overall scheduling" as "a major problem area this year." (DPFOF ¶ 31.) Rhinehart was responsible for scheduling and room assignments at that time. (DPFOF ¶ 32.)

5
Case 2:06-cv-00993-WEC   Filed 12/06/07   Page 5 of 20   Document 34

The course directors also cited "many breakdowns in the school's efforts to have classrooms and MUTS rooms ready and functioning at the assigned times. This includes not having rooms set-up as requested with functioning audiovisual and computer equipment and difficulty in reaching persons from Teaching Facilities when malfunctions occur during the course of a lecture." (DPFOF ¶ 33.) Rhinehart bore responsibility for the set-up of rooms with audiovisual equipment and computers at that time. (DPFOF ¶ 34.) The course directors' concerns with the sufficiency of the equipment in the auditoriums also fell within Rhinehart's area of responsibility. (DPFOF ¶ 35.)

The course directors attributed the problems with set-up, in part, to inadequate staffing of the Department with well-trained personnel. (DPFOF ¶ 36.) Campbell looked into the criticisms voiced by the course directors, and, as a result of those concerns, MCW decided to fill the Supervisor position left vacant by D'Amico's departure. (DPFOF ¶ 37.)

MCW hired Gil Plotkin for the Supervisor position in July 1999. (DPFOF ¶ 38.)

Rhinehart never applied for the Supervisor position. (DPFOF ¶ 39.) He nonetheless believes that MCW should have "just" moved him up into the job. (DPFOF ¶ 40.)

Rhinehart was not happy that Plotkin was hired. (DPFOF ¶ 41.) Rhinehart told Krumrei on numerous occasions, and in front of Plotkin, that he thought it was wrong that Plotkin was hired. (DPFOF ¶ 42.) Rhinehart also said repeatedly that he had better experience and qualifications than Plotkin. (DPFOF ¶ 43.)

As Rhinehart testified:

Q: You told Mr. Krumrei that you thought it was wrong that Mr. Plotkin was hired.

A: Yes. Yes, I did.

Q: And you told him that on numerous occasions?

6

> A: Yes, I did.
>
> Q: And you told him that in front of Mr. Plotkin?
>
> A: Yes.
>
> Q: And you articulated that you thought you had more experience and qualifications for the job?
>
> A: Yes.
>
> Q: So it would be a fair statement that MCW would have understood from what you said that you were not happy with Gil Plotkin's hiring?
>
> A: I wasn't celebrating it.

(DPFOF ¶ 43.)

MCW eventually took computer scheduling and reservations duties away from Rhinehart because of his mistakes and inaccurate reservations. (DPFOF ¶ 45.)

Plotkin gave Rhinehart a performance review on December 20, 2001. (DPFOF ¶ 46.) Plotkin's review generally gave Rhinehart "meets expectations" marks, except that Plotkin gave Rhinehart a below expectations mark for attitude. (DPFOF ¶ 47.) Plotkin stated on the review that Rhinehart "does not respond well to constructive criticism, needs to accept responsibility for personal mistakes." (DPFOF ¶ 48.) Rhinehart thought he knew how to do his job better than Plotkin, and he had told Plotkin the same. (DPFOF ¶ 49.) Rhinehart admits that a good employee must respond well to constructive criticism and take responsibility for his mistakes. (DPFOF ¶ 50.)

Rhinehart understood after this review that Plotkin wanted to see improvement in Rhinehart's response to constructive criticism. (DPFOF ¶ 51.)

Plotkin also noted that Rhinehart needed to take care to ensure that equipment was fully functioning before he left the location of the lecture. (DPFOF ¶ 52.) Rhinehart admits that during the time period prior to this review, he occasionally had failed to ensure that the equipment he delivered was properly functioning before he left. (DPFOF ¶ 53.)

Rhinehart signed this review. (DPFOF ¶ 54.) When Rhinehart does not agree with something, he does not sign it. (DPFOF ¶ 55.)

A few months after this review, in May 2002, a system malfunction occurred in an auditorium at MCW. (DPFOF ¶ 56.) Rhinehart and Plotkin had an argument while attempting to fix the malfunction, during which Rhinehart told Plotkin, "You don't know shit." (DPFOF ¶ 57.)

Rhinehart, Plotkin, and Krumrei met on May 30, 2002 to discuss the incident. (DPFOF ¶ 58.) During the meeting, Rhinehart again voiced his displeasure with not being promoted to the Supervisor position, and he again exhibited resentment toward Plotkin for being in that role. (DPFOF ¶ 59.) Rhinehart felt that Plotkin treated him like a "damn fool" because he told Rhinehart to do things Rhinehart already had done for seven years, and because Plotkin used "stupid sarcasm" toward Rhinehart and others at the College. (DPFOF ¶ 60.)

Krumrei told Rhinehart that he would need to defer to Plotkin on whether to adhere to or deviate from policy. (DPFOF ¶ 61.) Rhinehart was told that the May 30, 2002 discussion would be a verbal warning, and that similar incidents would not be tolerated. (DPFOF ¶ 62.)

Krumrei again reminded Rhinehart of MCW's willingness to provide training for him, at the College's expense. (DPFOF ¶ 63.) Rhinehart understood that his supervisors thought that the training would benefit him in his job. (DPFOF ¶ 64.) Rhinehart thought his supervisors were wrong, so he did not pursue the training. (DPFOF ¶ 65.)

Seven months later, on December 30, 2002, Plotkin gave Rhinehart his annual performance review. (DPFOF ¶ 66.) In this review, Plotkin gave Rhinehart several "above expectations" marks, and he further noted that Rhinehart had improved in several areas. (DPFOF ¶ 67.)

Rhinehart signed this review. (DPFOF ¶ 68.)

This positive trend did not continue over the following year; rather, on January 13, 2004, Plotkin gave Rhinehart a very negative annual review. (DPFOF ¶ 69.) Plotkin's review criticized Rhinehart for having no initiative, failing to complete reservation forms, continuing to resent his supervisor, and for being "sullen and unresponsive." (DPFOF ¶ 70.) Plotikin also calculated that Rhinehart had been late or absent over one hundred (100) times. (DPFOF ¶ 71.) Plotkin stated in conclusion: "Michael has regressed in several areas since his last review. His attitude is terrible and counter-productive to the future of the Teaching Facilities department. Hopefully he will see that this review is a wake-up call, and be more responsive to his job." (DPFOF ¶ 72.)

Rhinehart refused to sign this review. (DPFOF ¶ 73.) Rhinehart understood when he received this review, however, that MCW was dissatisfied with his job performance. (DPFOF ¶ 74.)

On February 2, 2004, Rhinehart received a written warning from Krumrei that encompassed several issues noted in Rhinehart's January 2004 review. (DPFOF ¶ 75.) Krumrei again pointed out that Rhinehart had been late or absent one hundred two (102) times in the past year, a point that Rhinehart concedes. (DPFOF ¶ 76.) Krumrei also noted in the warning that he had revised Rhinehart's hours so that Rhinehart would finish earlier in the day. (DPFOF ¶ 77.)

Krumrei further criticized Rhinehart for taking seventeen (17) sick days, which coincided with days on which MCW had no classes scheduled. (DPFOF ¶ 78.) Rhinehart admits that he often called in sick when there were no classes scheduled. (DPFOF ¶ 79.)

9

The written warning also referenced Rhinehart's decision to take a leave of absence the previous summer. (DPFOF ¶ 80.) MCW had asked Rhinehart to do some work on the facility with General Services during the summer months. (DPFOF ¶ 81.) Rhinehart refused to do so - in his words, "I told them I wasn't going to do it" - and he went on leave for the summer. (DPFOF ¶ 82.)

Krumrei also emphasized that "[i]n our past discussions you [Rhinehart] have never failed to voice your deep resentment that Gil Plotkin was hired as the Teaching Facilities supervisor," a point that Rhinehart also confirms was accurate. (DPFOF ¶ 83.)

The written warning advised Rhinehart that his job performance needed to immediately improve or he would face further disciplinary action, up to and including termination. (DPFOF ¶ 84.) Rhinehart again understood that MCW was dissatisfied with his performance at this time. (DPFOF ¶ 85.) Rhinehart also understood from Krumrei's warning that, at a minimum, he needed to be to work on time. (DPFOF ¶ 86.)

On Rhinehart's December 2004 performance evaluation, Plotkin indicated that Rhinehart had continued to be tardy on a frequent basis, and that the resulting "ramifications for disciplinary procedures have been discussed with Michael." (DPFOF ¶ 87.) Plotkin also criticized Rhinehart for taking too many breaks, lacking initiative, and failing to follow through on directions from his supervisor. (DPFOF ¶ 88.) Plotkin otherwise noted, however, that "[t]here has been improvement in several areas since Michael's last review. Hopefully this trend will continue and areas that need attention will improve." (DPFOF ¶ 89.)

Rhinehart signed this review. (DPFOF ¶ 90.)

In connection with the issue of continued tardiness, on December 28, 2004, Rhinehart received a final written warning in lieu of suspension. (DPFOF ¶ 91.) Rhinehart received the final

10

written warning because he admittedly had been tardy to work fifty-three times over the past year. (DPFOF ¶ 92.)

Rhinehart refused to sign this discipline. (DPFOF ¶ 94.) Rhinehart nonetheless understood that MCW found his tardiness unacceptable, and that his employer expected him to address it. (DPFOF ¶ 95.)

Even though Rhinehart understood from his written warning and final written warning that he needed to fix his tardiness problem, in 2005, Rhinehart continued to be tardy. (DPFOF ¶ 96.) When Plotkin spoke to Rhinehart about his continued tardiness in August 2005, Rhinehart responded by coming in late the very next day. (DPFOF ¶ 97.)

In September of 2005, when Plotkin directed Rhinehart to rewind some cables in a certain way, Rhinehart told Plotkin, "You rewind them yourself." (DPFOF ¶ 98.)

On October 17, 2005, MCW received a complaint that a room set-up had not occurred as requested. (DPFOF ¶ 99.) Rhinehart admits that this classroom set-up was, at least in part, his responsibility. (DPFOF ¶ 100.) Plotkin believed that Rhinehart had failed to complete the task. (DPFOF ¶ 101.)

Also in October 2005, Rhinehart left a laptop computer sitting on a podium in an auditorium unattended after the lecture had ended. (DPFOF ¶ 102.) Plotkin told Rhinehart that he did not want the computer left unattended in this manner. (DPFOF ¶ 103.)

On November 28, 2005, a lecture that Rhinehart was supposed to record could not be found in MCW's computer system. (DPFOF ¶ 104.) Although Rhinehart blamed the situation on a computer malfunction, the lectures held in the same auditorium before and after the lecture in question were both found in the computer system. (DPFOF ¶ 105.)

11

Plotkin believed that Rhinehart failed to record the lecture. (DPFOF ¶ 106.) Rhinehart expressed to Plotkin that "[t]here was a problem with the computer. If he's going to take the computer over what I'm telling him, that's fine. But I know I recorded it. Okay. I don't care what he says." (DPFOF ¶ 107.)

Finally, Rhinehart had left his facility keys and pager at home despite repeated reminders that he needed to leave his keys in the office and wear a pager at all times. (DPFOF ¶ 108.)

Based on all of these factors, along with Rhinehart's continued negative attitude and failure to respond to performance coaching, Krumrei and Plotkin decided to terminate Rhinehart's employment. (DPFOF ¶ 109.)

Krumrei has approved the termination of at least two Caucasian employees solely based on attendance issues. (DPFOF ¶ 110.)

Rhinehart claims that Plotkin and Krumrei terminated him because of his race. (DPFOF ¶ 111.) Rhinehart never heard Krumrei make a racist comment. (DPFOF ¶ 112.)

Rhinehart claims that Plotkin made fun of African-Americans on one occasion when Plotkin mocked the singing of an individual who sang on Martin Luther King Day. (DPFOF ¶ 113.) This incident allegedly occurred more than a year prior to Rhinehart's termination. (DPFOF ¶ 114.)

Rhinehart is not aware of any other comments that Plotkin made that Rhinehart believes showed a racist attitude towards African-Americans. (DPFOF ¶ 115.)

When asked to identify the facts that showed that MCW's stated reasons for his termination were not the true reason, Rhinehart cited Plotkin's "sarcasm." (DPFOF ¶ 116.) Plotkin was sarcastic to everyone, not just Rhinehart. (DPFOF ¶ 117.)

12

Rhinehart also claimed that Chad Wheeler, his co-worker, was allowed to "shoot the breeze" all day, while Rhinehart had to do all the work. (DPFOF ¶ 118.) Yet, Rhinehart admits that Wheeler did all of the scheduling for the department, he handled set-up and equipment issues for the second auditorium at MCW, and he helped with set-up for certain labs. (DPFOF ¶ 119.)

Rhinehart noted that Wheeler was allowed to use the internet during work hours, but Rhinehart conceded that he, too, surfed the internet while he was on the clock. (DPFOF ¶ 120.)

Rhinehart also alleged that Wheeler took time off any time he wanted, even when work needed to be done. (DPFOF ¶ 121.) Rhinehart could not identify one specific instance in which Wheeler took the day off when the department was busy. (DPFOF ¶ 122.)

Wheeler received positive performance reviews during the relevant time period, and his job performance was praised by those using MCW's facilities. (DPFOF ¶ 123.)

Rhinehart claimed that he was the only African American in the Department of Facilities, but he then acknowledged that MCW employs an African American supervisor in the area. (DPFOF ¶ 124.)

Rhinehart had no involvement in recruitment, and he has no idea who has applied for positions in the Department of Facilities in recent years. (DPFOF ¶ 125.)

On December 22, 2005, Rhinehart filed an employment discrimination complaint with the Wisconsin Equal Rights Division, which was cross-filed with the United States Equal Employment Opportunity Commission. (DPFOF ¶ 126.) In this administrative complaint, Rhinehart alleged that he had been discriminated against on the basis of his race in the terms and conditions of his employment (based upon alleged disparate treatment of Wheeler), and that he was terminated because of his race. (DPFOF ¶ 127.) Rhinehart did not allege discrimination in regards to

13

Rhinehart's failure to receive the Supervisor position given to Plotkin, and the Equal Rights Division did not make any finding on that issue. (DPFOF ¶ 128.)

Rhinehart filed his federal court complaint, *pro se*, on September 21, 2006 (the "Complaint"). DPFOF ¶ 129.) Rhinehart admits that the only claim that is the subject of the Complaint is his claim that MCW terminated him because of his race. (DPFOF ¶ 130.)

On April 12, 2007, MCW served Rhinehart with Defendant's First Set of Requests for Admissions (the "Requests'). (DPFOF ¶ 131.) The Requests included the following instructions to Rhinehart:

> Please read these instructions carefully. . . . Under Rule 36 of the Federal Rules of Civil Procedure, each matter of which an admission is requested shall be separately set forth. <u>The matter is deemed admitted unless, within 30 days after service of the request, you serve upon the attorney for the Defendant a written answer or objection addressed to the matter, signed by you or your attorney.</u>

(DPFOF ¶ 132.)

The Requests asked Rhinehart to admit, *inter alia*, that he was openly hostile towards Plotkin (Request 16), that he was terminated because of his performance problems (Request 17), that race was not a factor in MCW's decision to terminate him (Request 18), and that MCW did not discriminate against him on the basis on his race (Request 19). (DPFOF ¶ 133.) Rhinehart did not respond to these requests for admissions within thirty (30) days or at any point thereafter. (DPFOF ¶ 134.)

### III. DISCUSSION

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

14

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary

15

judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The defendant argues, and I agree, that Rhinehart's Title VII race discrimination claim "cannot get out of the starting blocks because he has admitted that his termination had nothing to do with race." (Def's Br. at 3.) More precisely, by failing to respond to the defendant's First Set of Requests for Admissions, Rhinehart is deemed to have admitted the truth of the facts contained therein. *See* Fed. R. Civ. P. 36(a); *see also Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1059 (7th Cir. 2000) (deeming the defendant's requests for admission admitted when the plaintiff failed to respond within the time allotted). Among those requests for admissions to which Rhinehart did not respond are: (1) that MCW terminated him because of his performance problems (Request 17); (2) that his race was not a factor in MCW's decision to terminate him (Request 18); and that MCW did not discriminate against him in any way because of his race (Request 19).

Additionally, however, Rhinehart failed to respond to the defendant's proposed findings of fact that were filed along with its motion for summary judgment. As a result, those facts are now the findings of fact in this case. And those facts clearly demonstrate that it was not because of his race

16

that Rhinehart's employment with MCW was terminated. Rather, it was due to performance deficiencies that his employment was terminated.

There are two methods to prove discrimination under Title VII, direct and indirect. [T]he direct method . . . requires the plaintiff to put forth evidence that demonstrates that [he] was a member of a protected class and *as a result* suffered the adverse employment action of which [he] complains. " *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 750 n.3 (7th Cir. 2006) (internal quotations omitted) (emphasis in original). A plaintiff may establish a direct case of discrimination through the use of direct or circumstantial evidence that "points directly to a discriminatory reason for the employer's action." *See Burks*, 464 F.3d at 750 n.3 (internal quotations omitted).

Direct evidence "is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). Direct evidence amounts to an admission of discriminatory intent by the defendant. *See Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999).

Circumstantial evidence can create a triable issue of fact under the direct method of proof, but only if it "point[s] directly to a discriminatory reason for the employer's action. Otherwise, the plaintiff must proceed by way of the well-known indirect route." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). No "direct" case of discrimination can exist where the circumstantial evidence does not support a direct inference of discrimination with relation to the specific employment action in question. *See Plasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006).

Rhinehart has not provided any direct or circumstantial evidence of discrimination such that he could proceed past summary judgment via the direct method of proof.

17

If a plaintiff, such as Rhinehart, has no evidence that will allow him to proceed under the direct method of proof, he may nevertheless attempt to show discrimination by using the indirect method of proof, which was established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the indirect method of proof, Rhinehart must first establish a prima facie case of discrimination. *See Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). If he succeeds in doing so, then the burden shifts to MCW to articulate a legitimate, nondiscriminatory reason for its action. If MCW succeeds in doing so, then the burden shifts back to Rhinehart to prove that the proffered reason for MCW's action is a pretext for unlawful discrimination. *See id.*

The elements of a prima facie case of race discrimination are as follows: (1) the plaintiff was member of a protected class; (2) he was performing his job satisfactorily; (3) the employer took an adverse employment action against him; and (4) the employer treated at least one similarly situated individual outside of his protected class more favorably. *See Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1011 (7th Cir. 2004). To be sure, Rhinehart has established elements one and three, to wit, he is an African-American and his employment was terminated by MCW. But, he has not demonstrated that he was performing his job satisfactorily. To the contrary, the undisputed facts demonstrate that he was <u>not</u> performing his job satisfactorily. Nor has he demonstrated that MCW treated at least one similarly situated individual outside the protected class more favorably than Rhinehart was treated. Again, quite to the contrary, the undisputed facts demonstrate that Krumrei terminated white employees for attendance issues alone.

But, even assuming that Rhinehart had succeeded in establishing a prima facie case of discrimination, he has not offered any evidence to show that the reason given by MCW for his termination (i.e., poor work performance) was a pretext for race discrimination. Pretext "means a dishonest explanation, a lie rather than a oddity or an error." *Peele v. Country Mutual Ins. Co.*, 288

18

F.3d 319, 326 (7th Cir. 2002). To establish pretext, Rhinehart must produce competent evidence showing that MCW's proffered reason either: (1) had no basis in fact; (2) did not actually motivate the action in question; or (3) was insufficient to motivate the action. *See Wells*, 289 F.3d at 1006.

In evaluating pretext, the court "do[es] not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of the decision." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). The inquiry must focus on "whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Id*. "[E]ven if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist." *Little*, 369 F.3d at 1012.

Simply stated, Rhinehart has not shown pretext. Indeed, he himself admits that he had the performance deficiencies that led to his termination. By way of example, he admits that he resented Plotkin and that he expressed that resentment to Plotkin and Krumrei. He admits that he was tardy. He admits that he rejected his supervisor's direction. He admits that he received bad reviews and repeated disciplinary action; that MCW not satisfied with his performance; and that MCW expected him to improve or he would lose his job.

As stated previously, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Rhinehart has failed to make such showing. Consequently, the defendant's motion for summary judgment must be granted.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

19

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

**SO ORDERED** this <u>6th</u> day of December 2007, at Milwaukee, Wisconsin.

<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge